# In the United States Court of Federal Claims
### OFFICE OF SPECIAL MASTERS
No. 18-0446V
UNPUBLISHED

| | |
|---|---|
| VIRGINIA WILT,<br><br>                           Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>                           Respondent. | Chief Special Master Corcoran<br><br>Filed: February 24, 2020<br><br>Special Processing Unit (SPU);<br>Decision Awarding Damages; Pain<br>and Suffering; Influenza (Flu)<br>Vaccine; Shoulder Injury Related to<br>Vaccine Administration (SIRVA) |

*Amy A. Senerth*, Muller Brazil, LLP, Dresher, PA, for petitioner.

*Christine Mary Becer*, U.S. Department of Justice, Washington, DC, for respondent.

### DECISION AWARDING DAMAGES[1]

On March 26, 2018, Virginia Wilt filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that she suffered from a right shoulder injury as a result of receiving an influenza ("flu") vaccine on September 20, 2016. Petition at 1. An amended petition was filed on June 13, 2018. The case was assigned to the Special Processing Unit ("SPU") of the Office of Special Masters.

For the reasons described below, I find that Petitioner is entitled to an award of damages in the amount **$110,270.00**, **representing compensation in the amount of $110,000.00 for actual pain and suffering, plus $270.00 for past unreimbursable expenses.**

---

[1] Because this unpublished Decision contains a reasoned explanation for the action in this case, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755.

## I.   Relevant Procedural History

On March 26, 2018, Ms. Wilt filed the Petition, Exhibits 1-3 containing medical records, and Ex. 4, an affidavit (ECF No. 1). On April 17, 2018, Petitioner filed Ex. 5-8, containing additional medical records (ECF No. 9). On March 4, 2018, Petitioner filed a Statement of Completion (ECF No. 10). On June 13, 2018 Petitioner filed an additional medical record designated Ex. 9, an amended petition, and a status report (ECF Nos. 12-14). On June 14, 2018, Petitioner filed another Statement of Completion (ECF No. 15). Petitioner filed Ex. 10 containing orthopedic records on July 10, 2018 (ECF No. 16-1).

On April 15, 2019, Respondent filed his Rule 4(c) report (ECF No. 27). Respondent took the position that Petitioner's injury did not meet the Table criteria for a claim of shoulder injury related to vaccine administration ("SIRVA"). Rule 4(c) Report at 4. Respondent asserted that this was "because [Petitioner's] pain extended beyond the vaccinated shoulder to her neck and elbow. " *Id.* at 5. However, Respondent nevertheless stated that he had "concluded that petitioner's right shoulder subdeltoid bursitis and associated pain was more likely than not caused by the September 20, 2016 flu vaccination." *Id.* Respondent further agreed that the case was timely filed, the vaccine was received in the United States, and that Petitioner suffered the residual effects or complications of her injury for more than six months. *Id.* Respondent noted that Petitioner averred that no civil action or proceedings had been pursued in connection with the vaccine-related injury. *Id.* As a result, Respondent conceded "that entitlement to compensation is appropriate." *Id.* at 5-6.

On April 19, 2019, a ruling on entitlement was entered finding that Petitioner was entitled to compensation (ECF NO. 28). The parties then commenced damages discussions.

On July 15, 2019, Petitioner represented that the parties could not agree on damages, and thereby asked that they be permitted to brief the issue for resolution. Petitioner's Status Report, filed July 15, 2019 (ECF No. 33). To that end, on October 16, 2019, Petitioner filed a damages brief (ECF No. 39), along with Exs. 11 and 12.  On November 5, 2019, Respondent filed a damages brief in response (ECF No. 40).

On January 10, 2020, I issued an order noting that Ex. 12 was cited and relied on in Petitioner's damages brief but was not an affidavit, and directed Petitioner to file an affidavit concerning her pain and suffering (ECF No. 41). On January 27, 2020, Petitioner filed a damages affidavit labeled Ex. 11 (ECF No. 42). Because the record already included an Ex. 11, this filing was stricken on January 30, 2020 (ECF No. 43). On February 7, 2020, Petitioner re-filed her damages affidavit as Ex. 13 (ECF No.44). The issue of the amount of damages to be awarded is now ripe for resolution.

## II.     Relevant Medical History

Petitioner's pre-vaccination medical history was significant for right shoulder arthritis and pain, neck pain, back pain, cervical radiculopathy, hypertension, degenerative arthritis, bilateral knee replacement, anxiety, and breast cancer. *See* Ex. 2 at 6-7, 16-17, 123-32, 138-46; Ex. 7. Beginning on November 12, 2015, approximately ten months prior to vaccination, she reported and was treated for neck pain radiating into her right shoulder. Ex. 7 at 7- 51. She also reported, and was treated by her chiropractor for, right shoulder aching and stiffness prior to vaccination beginning on November 23, 2015. Ex. 7 at 11-51. The records of her pre-vaccination right shoulder treatment consistently document that Petitioner's symptoms during this time were limited to stiffness and a pain level of two, or minimal pain. *Id.*

During this time period, from November 2015 until her September 30, 2016 flu vaccination, Petitioner was seen at Twin Rose Family Medicine, her primary care office, on five occasions. *See* Ex. 2 at 292-370 (recording visits on November 2, 2015, December 16, 2015, March 14, 2016, June 6, 2016, and September 28, 2016 primarily for follow up of hypertension, labs, and other non-orthopedic concerns). The records do not indicate that she sought treatment for her right shoulder from her primary care office during this time.

On September 28, 2016, two days prior to the vaccination at issue in this case, Petitioner was seen both by Dr. Scott Schucker of Twin Rose Family Medicine (Ex. 2 at 368) and by her chiropractor, Dr. Lydell Nunn (Ex. 7 at 51). The record of Petitioner's September 28, 2016 appointment with Dr. Schucker indicates that her chief complaint was dermatological, a bleeding skin tag on her neck.  Ex. 2 at 368.  The record does not indicate that any orthopedic concerns were raised or that an orthopedic examination was done during this visit. *Id.*

At the September 28, 2016 appointment with chiropractor Dr. Nunn, Petitioner reported neck pain, mid and low back pain, neck pain radiating into the right shoulder, and right shoulder pain. Ex. 7 at 51. The neck pain radiating into her right shoulder was described as "shooting in nature" and radiating. *Id.* Petitioner reported a pain level of three and that it occurred occasionally, approximately 25% of the time. *Id.* For her right shoulder, she reported stiffness and a pain level of "two which indicates a minimal level of pain." *Id.* This is nearly identical to the right shoulder symptoms she had been reporting to Dr. Nunn since November 2015. *See* Ex. 7 at 11-51.

On September 30, 2016, Petitioner, then 81 years old, received a flu vaccine. Ex.1 at 1. The vaccine was administered intramuscularly into Petitioner's right arm. *Id.*

On October 5, 2016, Petitioner presented to Dr. Bret Daniels of Twin Rose Family Medicine with complaints of bruising on her right upper arm "after having vaccine" on September 30. Ex. 2 at 381. The record indicates that she reported right arm pain at the site of the flu shot given on September 30, and that the pain radiated to her elbow and the right side of her neck. *Id.* On examination, Dr. Daniels found that Petitioner

3

experienced pain with abduction of her right arm past 120 degrees. *Id.* at 382. Otherwise he recorded her right arm orthopedic and neurology exam as within normal limits. *Id.*

On October 12, 2016, Petitioner was seen by chiropractor Dr. Nunn. Ex. 7 at 53. The subjective complaints section of the record contains the same sections as Petitioner's pre-vaccination September 28, 2016 chiropractic record: neck pain, mid back pain, low back pain, neck pain radiating into the right shoulder, and right shoulder. *Id.* at 51-53.

In the "Neck Pain Radiating into the Right Shoulder" section, the description of Petitioner's symptoms and pain level on October 12, 2016 is the same as that of September 28, 2016 (two days prior to vaccination). Id. In the "Right Shoulder" section of Dr. Nunn's records, the description of the pain and symptoms on October 12, 13 days after vaccination, differs from that of her pre-vaccination September 28 record. The September 28, 2016 (pre-vaccination) record indicates that Petitioner reported right shoulder stiffness with a pain level of "two which indicates a minimal level of pain." Ex. 7 at 51. However, the "Right Shoulder" section of the October 12, 2016 (post-vaccination) record states:

> A burning sensation is being reported by the patient. A sharp pain is being described by the patient. Stiffness is being presented as a complaint. On this visit, the patient is reporting a pain level of 6/10 which indicates a moderate level of pain. Comments Mrs. Wilt had a nurse give her a flu shot. The nurse put the injection in the shoulder joint.

*Id.* at 53.

On October 20, 2016, Petitioner returned to Dr. Daniels. Ex. 2 at 395. Petitioner reported that on October 12, 2016, she saw a chiropractor who performed massage treatment that relieved her symptoms. *Id.* However, her symptoms reappeared a day or so later. *Id.* She reported that home massage and heat helped, but that she still experienced persistent right shoulder pain with use. *Id.* On examination, Dr. Daniels was able to reproduce Petitioner's right deltoid area pain with resisted abduction. *Id.* at 396. Testing of the active range of motion of Petitioner's neck did not reproduce Petitioner's symptoms. *Id.* Her right upper extremity strength and light touch testing were within normal limits. *Id.*

On October 27, 2016, Petitioner was seen by physical therapist Aaron Mackley. Ex. 8 at 10. She reported a history of pain in her right shoulder and arm following a flu shot. *Id.* at 11. The record lists the date of onset as September 30, 2016. *Id.* She reported that she received a flu shot and started experiencing pain down her arm afterward. *Id.* She reported a pain level of 6/10 at the time of the appointment and 9/10 at worst. *Id.* at 12. On examination, her right shoulder range of motion ("ROM") was found to be 138 degrees in active abduction, rather than 170-180, and internal rotation was 56 degrees rather than 70-90.[3]  *Id.* at 11-12.

---

[3] Normal shoulder abduction for adults ranges from 170 to 180 and normal internal rotation for adults varies from about 70 to 90 degrees. Cynthia C. Norkin and D. Joyce White, MEASUREMENT OF JOINT MOTION: A GUIDE TO GONIOMETRY 80, 84 (F. A. Davis Co., 5th ed. 2016).

During the October 27, 2016 physical therapy evaluation, Petitioner was assessed with "impingement syndrome, tenderness, decreased ROM and strength, and decreased functional tolerance." Ex. 8 at 11. Mr. Mackley noted that Petitioner was "previously unrestricted with activity" and that she had a good rehab prognosis. *Id.* He recommended physical therapy two to three times a week for six weeks. *Id.* at 14. Her treatment goals included being able to use her right arm to perform normal activities of daily life and to increase her right shoulder strength to 4+/5. *Id.*

On November 1, 2016, Petitioner reported for physical therapy with Patrick McCart. Ex. 8 at 31. She reported feeling "lousy" and that her pain was interfering with her sleep and home exercises. *Id.* at 31-32. She reported that IcyHot patches helped and reported a current pain level of 6/10. *Id.* at 32. Mr. McCart observed "notable warmth over the lateral deltoid region and mild edema." *Id.* He noted that Petitioner experienced "[p]ain with endrange motions." *Id.* He assessed her as having "increased tenderness and soreness . . . as well as increased tightness/decreased ROM." *Id.* Following the session, she reported fatigue and soreness, but no pain. *Id.*

On November 3, 2016, Petitioner again reported for physical therapy with Mr. McCart. Ex. 8 at 46. She reported soreness, mostly in her distal bicep. *Id.* at 46-47. She reported that the day before was "pretty good until I went to bed," at which point she experienced pain and required medication. *Id.* at 47. She reported a current pain level of 7/10. *Id.*

On November 8, 2016, Petitioner had her fourth physical therapy session. Ex. 8 at 61. She was seen by Aaron Mackley, who noted that she demonstrated "overall improved R[ight] shoulder strength and decreased tenderness upon palpation." *Id.* She reported "min[imum] to no pain and [was] able to perform [her] normal activities." *Id.* On examination, Mr. Mackley still documented "notable warmth over the lateral deltoid region and mild edema" and "[p]ain with endrange motions." *Id.* at 66. He evaluated her right upper extremity strength and found that in her flexors and abductors, her strength had improved from an initial level of 3+ to 4+. *Id.* at 62. For external rotators her strength had improved from 3+ to 5. *Id.* Mr. Mackley found that Petitioner's therapy goals had been met and she was independent with her home exercise program, and discharged her from physical therapy. *Id.* at 61. It does not appear that her ROM was evaluated at this appointment. *Id.* at 61-62.

On November 9, 2016, Petitioner returned to chiropractor Dr. Nunn. Ex. 7 at 56-57. She reported neck pain, mid and low back pain, neck pain radiating into the right shoulder, and right shoulder pain and stiffness. *Id.* She described her right shoulder pain as a sharp pain at a level of 6/10. *Id.* She also reported a burning sensation in her right shoulder. *Id.*

On November 30, 2016, Petitioner was seen by Dr. Nunn. Ex. 7 at 58. She again reported a burning sensation and sharp pain in her right shoulder and a pain level of 6/10. *Id.* She reported that she would be having a right shoulder x-ray on December 2, 2016

5

related to the shoulder pain she had been experiencing since her flu shot on September 30. *Id.*

On December 2, 2016, Petitioner returned to Dr. Daniels. Ex. 2 at 409. Petitioner reported that she continued to experience right shoulder pain related to her flu shot. *Id.* On examination, she had full active range of motion but experienced pain with abduction past 90 degrees. *Id.* at 411. She had a positive empty can impingement sign and the subacromial area was tender to palpation. *Id.* Her right upper extremity strength and light touch testing remained within normal limits. *Id.* Right shoulder x rays were done and Dr. Daniels referred Petitioner to an orthopedist. *Id.*

On December 19, 2016, Petitioner was seen by physician assistant ("PA") Jessica Fittipaldi in the office of orthopedist Dr. Thomas Westphal. Ex. 3 at 16-17. Petitioner reported right shoulder pain that "started over 3 months ago after a flu shot." *Id.* at 16. She reported that she had failed to improve with rest, activity modification, physical therapy, and over the counter medications. *Id.* On examination, she was found to experience tenderness in the biceps tendon. *Id.* at 20. Her right shoulder range of motion in active abduction and extension were recorded as "abnormal." *Id.* Her muscle strength with abduction and in the supraspinatus were both reduced, at 3/5. *Id.* She exhibited positive impingement and drop arm signs. *Id.* An MRI was recommended. *Id.* at 16.

On December 21, 2016, Petitioner returned to Dr. Nunn. Ex. 7 at 60-61. She reported neck pain, mid and low back pain, neck pain radiating into her right shoulder, and right shoulder pain with a burning sensation and stiffness. *Id.* She reported a pain level of 6/10. *Id.* She reported that she was scheduled for an MRI two days later, on December 23, 2016. *Id.*

Petitioner returned to Dr. Nunn on January 4, 2017, January 18, 2017, and February 1, 2017, reporting similar symptoms. Ex. 7 at 62-63, 64-65, 66-67. At her February 1, 2017 appointment she reported that she would be having arthroscopic surgery on her shoulder the following day. *Id.* at 66.

On January 9, 2017, Petitioner presented to orthopedist Dr. Westphal to review her right shoulder MRI. Ex. 3 at 13. She reported that her symptoms had not changed since her last appointment. *Id.* On examination, Dr. Westphal found that her right shoulder range of motion was passively normal with strength at a level of 4/5. *Id.* at 15-16. Dr. Westphal reviewed the MRI and found that it revealed a full thickness tear of the subscapularis tendon, partial thickness articular surface tear of the distal supraspinatus tendon, mild subacromial subdeltoid bursitis, moderate tendinosis, and osteoarthritis of the glenohumeral joint. *Id.* at 16. He found that Petitioner's symptoms were impairing her quality of life and that surgery was indicated to reduce pain and improve her quality of life. *Id.* at 12-13.

On January 30, 2017, Petitioner presented to Dr. Daniels for a pre-operative examination. Ex. 2 at 440. She reported that she would be having right shoulder arthroscopic surgery on February 2 with Dr. Westphal. *Id.*

On February 2, 2017, Petitioner underwent shoulder surgery.[4] Ex. 3 at 35-37. Dr. Westphal performed an examination under anesthesia, diagnostic arthroscopy, arthroscopic subacromial decompression, arthroscopic biceps tenotomy (release), arthroscopic rotator cuff repair, and major debridement of the shoulder. *Id.* Dr. Westphal "elected not to perform a biceps tenodesis at this time." *Id.* at 36-37. There were no complications. *Id.* at 37.

On February 10, 2017, Petitioner was seen by PA Fittipaldi in Dr. Westphal's office. Ex. 3 at 9. She reported that she was taking pain medication at bedtime and was doing well overall. *Id.* On examination, Petitioner's wounds were found to look healthy. *Id.* at 12. Her shoulder range of motion and strength were not assessed. *Id.*

On February 14, 2017, Petitioner reported for physical therapy with Stephanie Graver. Ex. 8 at 78. She reported her pain level as 2/10 at the appointment and 8/10 "for brief moments" at worst. *Id.* at 80. She reported that she was unable to use her right upper extremity for activities of daily living, unable to carry objects and complete housework, and that her sleep was interrupted. *Id.* at 79. The record indicates that she was assessed with impaired functional use of her right upper extremity secondary to post-operative restrictions with decreased ROM, decreased strength, pain, and decreased positional tolerance. *Id.* On examination, her right shoulder passive ROM in flexion was 90, rather than 165-180; in abduction 70, rather than 180; and her external rotation was 40 rather than 90-100.[5] *Id.* Physical therapy was recommended 2-3 times a week for eight weeks. *Id.*

On February 16, 2017, Petitioner reported for physical therapy with Patrick McCart. Ex. 8 at 100. She reported feeling "[n]ot too bad" and that she "didn't have any pain, but [her] arm started to become sore and achy." *Id.* She reported achy pain at a level of 2/10. *Id.* She presented with increased tightness and decreased ROM of her right shoulder. *Id.* at 101. She reported fatigue and soreness but no pain at the end of her session. *Id.*

On February 20, 2017, Petitioner was seen for physical therapy with Christin Holder. *Id.* at 116. At the beginning of the session she reported a pain level of 4/10, assessed as mild/moderate. *Id.* at 116-17. She reported "minimal pain at end ranges" and

---

[4] The Operative Report indicates that the surgery was done on Petitioner's left shoulder due to left shoulder problems. Ex. 3 at 35-37. However, Petitioner's other medical records generally refer to right shoulder symptoms. *See generally* Ex. 2, 3, 7, 10. In addition, the records of her post-operative follow up appointments indicate that the surgery was done on her right shoulder. *See, e.g.*, Ex. 3 at 6 (March 10, 2017 appointment with Dr. Westphal indicating that Petitioner was "5 week(s) s/p *right* shoulder arthroscopy with RCR [rotator cuff repair], major debridement, biceps release and SAD [subacromial decompression]") (emphasis added); Ex. 3 at 2 (April 2, 2017 appointment with Dr. Westphal indicating that she was "S/P [status post, or following] *RIGHT* rotator cuff repair") (emphasis added); *but see* Ex. 3 at 9 (February 10, 2017 appointment assessing Petitioner with "Acute pain of *left* shoulder" but further down on the same page stating that Petitioner is "1 week(s) s/p *right* shoulder" surgery) (emphases added). The parties do not dispute which shoulder the surgery was performed on, and I find that the preponderance of the evidence indicates that the surgery was done on Petitioner's right shoulder.

[5] Normal shoulder flexion for adults ranges from 165 to 180 and normal external rotation for adults varies from about 90 to 100 degrees. Cynthia C. Norkin and D. Joyce White, MEASUREMENT OF JOINT MOTION: A GUIDE TO GONIOMETRY 72, 88 (F. A. Davis Co., 5th ed. 2016).

7

demonstrated tightness and ROM restriction. *Id.* at 117. She reported "an increase in pain post exercises at 6/10." *Id.* Following ice and electrical stimulation she reported a pain level of 2/10 when she left the facility. *Id.*

On February 23, 2017, Petitioner reported for physical therapy with Christin Holder. Ex. 8 at 132. She reported a pain level of 1/10 at rest upon arrival. *Id.* She reported "minimal pain at end ranges" and demonstrated tightness and ROM restriction throughout. *Id.* Following the session, she reported feeling fatigued and a slight increase in pain to 2/10. *Id.* Following ice and electrical stimulation, her pain level was back to 1/10. *Id.*

On February 27, 2017, Petitioner was seen for physical therapy with Patrick McCart. Ex. 8 at 150. She arrived feeling "[n]ot too bad" but added that the day prior "it hurt so bad, and the only thing I can think of is that I slept on my shoulder." *Id.* She reported that she had to take pain medication the night before, and reported pain reaching a level of 5/10. *Id.* She reported that her current pain level was 1/10. *Id.* Her right shoulder passive range of motion was assessed and found to be 135 degrees in flexion (compared to 90 degrees at the beginning of treatment), 90 degrees in abduction (compared to 70 degrees at the beginning of treatment). *Id.* Her external rotation remained 40 degrees, unchanged since she began treatment after her surgery. *Id.* She was assessed with "progression overall with improved ROM of her R shoulder." *Id.*

On March 2, 2017, Petitioner was seen for physical therapy by Stephanie Graver. Ex. 8 at 148.[6] She reported "on and off (R) shoulder discomfort [but] denies presence of pain at start of session." *Id.* She was assessed with demonstrating "mild limitations in (R) shoulder external rotation and flexion PROM [passive range of motion] . . . pain at end range of 2/10 intensity." *Id.* at 149. She reported no pain at the end of the session. *Id.*

On March 6, 2017, Petitioner was seen for physical therapy by Christin Holder. Ex. 8 at 167. Petitioner reported shoulder pain of 3/10 at rest. *Id.* at 168. She "had fair tolerance for manual stretching/PROM to the R shoulder with tightness at end range and ROM restrictions throughout but no increase in pain verbalized." *Id.* She reported no pain at the end of the session. *Id.*

On March 8, 2017, Petitioner reported to Stephanie Graver for physical therapy. Ex. 8 at 166. She reported continued intermittent right shoulder discomfort at a level of 3-4/10 at worst. *Id.*[7]

---

[6] The pages containing the record of this visit have an "Encounter date" of 2/27/2017. *See* Ex. 8 at 138-156. However, Ex. 8 at 147-149 and 152-153 pertain to a March 2, 2017 physical therapy appointment with Stephanie Graver (while Ex. 8 at 149-151 and 154-155 document a February 27, 2017 physical therapy session with Patrick McCart). It appears that the record for the March 2, 2017 visit was inadvertently included in the 2/27/17 "encounter" date in the electronic medical record system.

[7] This record is included under "Encounter date" of 3/6/2017. Similar to the issue noted in footnote 6, it appears that Petitioner was seen on both 3/6 and 3/8 and that both visits were inadvertently recorded under the 3/6/2017 "encounter" date in the electronic medical record system.

8

On March 9, 2017, Petitioner was seen for physical therapy with Patrick McCart. Ex. 8 at 184. She reported feeling "[n]ot too bad" but added that she was "now getting more irritation at the top of my shoulder when before it was lower into my arm, but it is nothing I can't handle." *Id*. She rated her pain at a level of 1/10. *Id*. Her right shoulder passive ROM was found to have improved. In abduction, her ROM was 110 degrees (compared to 70 at the beginning of treatment) and in external rotation her ROM was now 65 degrees (compared to 40 at the beginning of treatment). *Id*. at 184-85. She reported that she would see her surgeon the following day and that she would call to schedule further appointments if the surgeon directed her to continue. *Id*. at 185.

On March 10, 2017, Petitioner was seen by Dr. Westphal five weeks following her shoulder surgery. Ex. 3 at 8. She reported minimal pain and that she was making good progress in physical therapy. *Id*. at 6. Dr. Westphal found that her wounds were healed and that her range of motion and strength were "diminished as expected." *Id*. Her comfort level was "satisfactory." *Id*.

On March 13, 2017, Petitioner was seen for physical therapy by Patrick McCart. Ex. 8 at 200. She reported feeling good and that over the weekend her shoulder had improved and she was not in pain. *Id*. She was assessed as "reporting no pain symptoms" and "demonstrates progression overall with improved strength and ROM of her R shoulder." *Id*. at 201.

On March 16, 2017, Petitioner reported to Stephanie Graver for physical therapy. Ex. 8 at 216. She reported "twinges of (R) anterior shoulder pain." *Id*. She denied the presence of pain at rest and denied an increase in pain with progression to active ROM and active assisted ROM. *Id*.

On March 20, 2017, Petitioner was seen by Christin Holder for physical therapy. Ex. 8 at 232. Petitioner arrived reporting "discomfort noting she feels like she strained her shoulder pulling a quilt out of the washer on Saturday." *Id*. She rated the pain at 1/10. *Id*.

On March 23, 2017, Petitioner was seen by Patrick McCart for physical therapy. Ex. 8 at 248. She reported feeling "[n]ot bad" and that she got "twinges from time to time, but it's nothing serious." *Id*. She reported no pain. *Id*. At this appointment, her active range of motion was assessed.[8] *Id*. She was found to have active range of motion of 118 degrees in flexion, 105 degrees in abduction, and 75 degrees in external rotation.

On March 23, 2017, Petitioner was seen by her chiropractor, Dr. Nunn. Ex. 7 at 68-69. She reported neck pain, mid and low back pain, neck pain radiating into her right shoulder, and right shoulder soreness at a level of five on a scale of 1-10. *Id*. at 68.

---

[8] During previous appointments passive, rather than active, range of motion had been assessed. Active range of motion "is the arc of motion produced by the individual's voluntary unassisted muscle contraction," while passive range of motion "is the arc of motion produced by the application of an external force by the examiner." Cynthia C. Norkin and D. Joyce White, MEASUREMENT OF JOINT MOTION: A GUIDE TO GONIOMETRY 88, at 8 (F. A. Davis Co., 5th ed. 2016). Normally, "passive ROM is slightly greater than active ROM because each joint has a small amount of motion that is not under voluntary control." *Id*. Thus, the active ROM numbers found at the March 20, 2017 examination are comparable to the passive ROM numbers at the March 9, 2017 appointment, with the exception of external rotation, which had improved by March 20.

On March 27, 2017, Petitioner reported to Christin Holder for physical therapy. Ex. 8 at 264. She reported no complaints of pain at rest. *Id.* Her examination was unremarkable. *Id.* During the session she reported occasional twinges of pain that subsided with rest. *Id.* at 265. She was found to have "minimal passive range of motion deficits" and was improving her active ROM. *Id.* She had no pain following the session. *Id.*

On March 30, 2017, Petitioner was seen by Stephanie Graver for a physical therapy session. Ex. 8 at 280. She reported that she was not in pain. *Id.* She reported that her ability to complete household tasks using her right upper extremity had improved. *Id.* at 281. She demonstrated mild deficits in right shoulder passive ROM. *Id.*

On April 3, 2017, Petitioner was seen by Christin Holder for physical therapy. Ex. 8 at 296. She reported no shoulder pain. *Id.* She was assessed as "demonstrat[ing] minimal limitation and end range tightness with shoulder flexion stretching." *Id.*

On April 5, 2017, Petitioner returned to Dr. Nunn. Ex. 7 at 70-71. She reported right shoulder stiffness and pain at a level of 3/10. *Id.* at 70.

On April 6, 2017, Petitioner was discharged from physical therapy after 16 visits. Ex. 8 at 312. She reported that she remained pain free and was not experiencing difficulty with activities of daily life. *Id.* She was found to be "pain free with return to prior level of function" with activities of daily living. *Id.* Her Disabilities of the Arm, Shoulder and Hand ("DASH") score had decreased from 80% disability to 9% disability. *Id.* She was independent with her home exercise program and it was determined that she no longer required skilled therapy intervention. *Id.*

On April 7, 2017, Petitioner was seen by Dr. Westphal for a post-operative visit, eight weeks following her shoulder surgery. Ex. 3 at 2. She reported minimal pain and that her strength was good. *Id.* On examination, her shoulder range of motion was found to be "near full" and her strength was improving. *Id.* at 5. Dr. Westphal anticipated that she would reach maximum medical improvement within 3-6 months. *Id.* at 2.

On April 26, 2017, Petitioner was seen by Dr. Nunn. Ex. 7 at 72-73. At this visit, she reported neck pain, mid and low back pain, and neck pain radiating into her right shoulder. *Id.* at 72. The portion of the record for subjective complaints no longer contained a separate section related solely to right shoulder pain. *Id.* The description of Petitioner's symptoms in the section concerning "Neck Pain Radiating into the Right Shoulder" remained consistent both pre- and post-vaccination in visits dating from November 12, 2015 to September 28, 2017. Ex. 7 at 7-91. Thus, I find that these symptoms were unrelated to Petitioner's September 30, 2016 vaccination.

On July 13, 2017, Petitioner presented to PA Fittipaldi for a right shoulder follow-up. Ex. 10 at 29. She reported intermittent achy discomfort in her shoulder. *Id.* She had anticipated that she would be pain-free at this point, but was told that full recovery takes

10

approximately a year. *Id.* at 28. On examination, her right shoulder wounds were healed and she had full range of motion and good strength in all directions. *Id.* at 32.

### III.   Testimony and/or Affidavits

On October 16, 2019, Petitioner filed Ex. 12, a typewritten statement signed by Petitioner addressing the limitations her shoulder injury has caused to her activities. Ex. 12. The statement indicates that the pain and suffering from this injury was "greater than having my 2 knees replaced in individual surgeries." Ex. 12. The statement indicates that Petitioner must continue to be careful about lying on her shoulder and still has difficulty with typing on the computer and gardening. *Id.* The statement was not submitted as an affidavit or sworn statement, which reduced its value as evidence. Therefore, I directed Petitioner to file an affidavit.

On February 7, 2020, Petitioner filed Ex. 13, titled "Affidavit Regarding Damages." In her damages affidavit, Petitioner averred that the vaccination "caused me to suffer pain, surgery, lack of much physical activity to the current day for weakness in shoulder/arm, which is still there. I feel weakness in shoulder using the right arm for many activities during house work, cooking, and outdoor chores." Ex. 13 at 2. She added that her injury "has restricted my gardening abilities, yardwork, driving for any length of time." *Id.* at 3. Petitioner averred that she continues to suffer from shoulder pain, inability to lift with her right arm and some movement, and that following surgery she took hydrocodone for pain and that she continues to take acetaminophen three times daily. *Id.* at 4.

### IV.   The Parties' Arguments

Petitioner seeks damages in the total amount of $140,270.00, comprised of $140,000.00 for pain and suffering and $270.00 for past out of pocket medical expenses. Petitioner's Brief in Support of Damages ("Pet. Br."), filed Oct. 16, 2019, at 1 (ECF No. 39).[9]

To support the pain and suffering component of her damages request, Petitioner notes that her shoulder injury required surgical intervention and two separate rounds of physical therapy. *Id.* at 8. She adds that she sought treatment promptly, six days after vaccination, and this therefore distinguishes her case from others where Petitioners delayed seeking treatment. *Id.* Rather, Ms. Wilt maintains that her case is similar to *Collado v. Sec'y of Health & Human Servs.*, No. 17-0225V, 2018 WL 3433352 (Fed. Cl. Spec. Mstr. June 6, 2018), except that here, her surgeon indicated her recovery would take a year or more post-surgery. *Id.* at 9.

Respondent proposes a pain and suffering award of no more than $77,500.00. Respondent's Brief on Damages ("Res. Br.") at 1 (ECF No. 40). The majority of Respondent's damages brief addresses his position that I should adopt the "continuum

---

[9] In her Affidavit Regarding Damages dated January 24, 2020 (Ex. 13), Petitioner included a higher "estimate" of out of pocket expenses in the amount of $1,000 but (as further explained in Section VII.B. below) she did not provide required supporting documentation to substantiate these additional expenses, so her award is limited to the amount actually substantiated ($270.00).

11

approach" for determining pain and suffering used by many special masters before this methodology was called into question in *Graves v. Sec'y of Health & Human Servs.*, 109 Fed. Cl. 569, 590 (2013). Under this approach, the statutory maximum of $250,000.00 was reserved for those who were the most severely injured and who have or will suffer the most pain, suffering, or emotional distress. *Id.* at 583. Respondent also emphasizes that the text of Section 15(a)(4) contemplates that at least *some* petitioners would be awarded less than the statutory maximum.

Respondent also argues that the specific facts of this case only justify an award of $77,500.00 for pain and suffering. Res. Br. at 12. Respondent notes that Petitioner had surgery five months after her vaccination and by April 2017 (seven months post-vaccination) reported no pain. *Id.* In addition, less than a year after Petitioner's vaccination her doctor noted that she had full range of motion in her shoulder and good strength. *Id.* From this, Respondent concludes that Petitioner did not require "consistent, ongoing treatment, after ten months." *Id.* Respondent adds that Petitioner does not have ongoing pain that would warrant an award on the higher end of the statutory range. *Id.*

### V.     Legal Standard

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Human Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Human Servs.*, No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Human Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is

nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case"). And, of course, I may rely on my own experience (along with my predecessor Chief Special Masters) adjudicating similar claims.[10] *Hodges v. Sec'y of Health & Human Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

Although pain and suffering in the past was often determined based on a continuum, as Respondent argues, that practice was cast into doubt by the Court several years ago. In *Graves*, Judge Merrow rejected a special master's approach of awarding compensation for pain and suffering based on a spectrum from $0.00 to the statutory $250,000.00 cap. Judge Merrow maintained that do so resulted in "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Graves*, 109 Fed. Cl. at 590. Instead, Judge Merrow assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id.* at 595. Under this alternative approach, the statutory cap merely cuts off *higher* pain and suffering awards – it does not shrink the magnitude of *all* possible awards as falling within a spectrum that ends at the cap.

## VI.     Prior SIRVA Compensation

As an initial matter, I note that Ms. Wilt's petition initially asserted a Table injury of right shoulder injuries resulting from the flu vaccine. Pet. at 1. However, Respondent determined that this case did not meet the SIRVA Table criteria, and instead conceded entitlement for "right shoulder subdeltoid bursitis and associated pain." Rule 4(c) report at *5. Nevertheless, in their damages briefs, the parties treat this case as a SIRVA case and cite SIRVA damages decisions. I agree that SIRVA damages decisions provide an appropriate framework for analyzing Petitioner's pain and suffering, since Petitioner's symptoms, course of treatment, and outcome are similar to those commonly found in SIRVA cases.

---

[10] From July 2014 until September 2015, the SPU was overseen by former Chief Special Master Vowell. For the next four years, until September 30, 2019, all SPU cases, including the majority of SIRVA claims, were assigned to former Chief Special Master Dorsey, now Special Master Dorsey. In early October 2019, the majority of SPU cases were reassigned to me as the current Chief Special Master.

### A. Overview of SIRVA Case Damages Outcomes in Settled Cases[11]

SIRVA cases have an extensive history of informal resolution within the SPU. As of January 1, 2020, 1,405 SIRVA cases have informally resolved[12] since SPU's inception in July of 2014. Of those cases, 817 resolved via the government's proffer on award of compensation, following a prior ruling that petitioner is entitled to compensation.[13] Additionally, 567 SPU SIRVA cases resolved via stipulated agreement of the parties without a prior ruling on entitlement.

Among the SPU SIRVA cases resolved via government proffer, awards have typically ranged from $75,044.86 to $122,038.99.[14] The median award is $95,000.00. Formerly, these awards were presented by the parties as a total agreed-upon dollar figure without separately listed amounts for expenses, lost wages, or pain and suffering. Since late 2017, the government's proffer has included subtotals for each type of compensation awarded.

Among SPU SIRVA cases resolved via stipulation, awards have typically ranged from $50,000.00 to $92,500.00,[15] with a median award of $70,000.00. In most instances, the parties continue to present the stipulated award as a total agreed upon dollar figure without separately listed amounts for expenses, lost wages, or pain and suffering. Unlike the proffered awards, which purportedly represent full compensation for all of petitioner's damages, stipulated awards also typically represent some degree of litigative risk negotiated by the parties.

---

[11] I use the term "settled" broadly, to include both cases that the Department of Justice resolves via litigative risk discussions and those it proffers (meaning the Government represents that the damages sum accurately reflects its liability under the Act in the relevant case). Prior decisions awarding damages, including those resolved by settlement or proffer, are made public and can be searched on the U.S. Court of Federal Claims website by keyword and/or by special master. On the court's main page, click on "Opinions/Orders" to access the database. All figures included in this order are derived from a review of the decisions awarding damages within the SPU. All decisions reviewed are, or will be, available publicly. All figures and calculations cited are approximate.

[12] Additionally, 41 claims alleging SIRVA have been dismissed within the SPU.

[13] Additionally, there have been 21 prior cases in which petitioner was found to be entitled to compensation, but where damages were resolved via a stipulated agreement by the parties rather than government proffer.

[14] Typical range refers to cases within the second and third quartiles. Additional outlier awards also exist. The full range of awards spans from $25,000.00 to $1,845,047.00. Among the 21 SPU SIRVA cases resolved via stipulation following a finding of entitlement, awards range from $45,000.00 to $1,500,000.00 with a median award of $115,772.83. For these awards, the second and third quartiles range from $90,000.00 to $160,502.39.

[15] Typical range refers to cases within the second and third quartiles. Additional outlier awards also exist. The full range of awards spans from $5,000.00 to $509,552.31. Additionally, two stipulated awards were limited to annuities, the exact amounts of which were not determined at the time of judgment.

### B. Specific Prior Reasoned Decisions Addressing SIRVA Damages

Additionally, since the inception of SPU in July 2014, there have been a number of reasoned decisions awarding damages in SPU SIRVA cases – meaning where the parties were unable to informally resolve damages, so the dispute was adjudicated and ruled upon by a special master. Typically, the primary point of dispute has been the appropriate amount of compensation for pain and suffering.

#### i. Below-median awards limited to past pain and suffering

In seventeen prior SPU cases, the petitioner was awarded compensation for only actual or past pain and suffering in amounts below the median proffer figure discussed above, and in a range from $60,000.00 to $90,000.00.[16] These cases have all included injuries with a "good" prognosis, although some of the petitioners asserted residual pain. All of the petitioners in such cases displayed only mild to moderate limitations in range of motion, and MRI imaging likewise showed only evidence of mild to moderate pathologies such as tendinosis, bursitis, or edema. The duration of injury ranged from six to 29 months, with such petitioners averaging approximately fourteen months of pain.

---

[16] These cases are: *Dagen v. Sec'y of Health & Human Servs.*, No. 18-0442V, 2019 WL 7187335 (Fed. Cl. Spec. Mstr. Nov. 6, 2019) (awarding $65,000.00 for actual pain and suffering and $2,080.14 for actual unreimbursable expenses); *Goring v. Sec'y of Health & Human Servs.*, No. 16-1458V, 2019 WL 6049009 (Fed. Cl. Spec. Mstr. Aug. 23, 2019) (awarding $75,000.00 for actual pain and suffering and $200.00 for actual unreimbursable expenses); *Lucarelli v. Sec'y of Health & Human Servs.*, No. 16-1721V, 2019 WL 5889235 (Fed. Cl. Spec. Mstr. Aug. 21, 2019) (awarding $80,000.00 for actual pain and suffering and $380.54 for actual unreimbursable expenses); *Kent v. Sec'y of Health & Human Servs.*, No. 17-0073V, 2019 WL 5579493 (Fed. Cl. Spec. Mstr. Aug. 7, 2019) (awarding $80,000.00 for actual pain and suffering and $2,564.78 to satisfy petitioner's Medicaid lien); *Capasso v. Sec'y Health & Human Servs.*, No.17-0014V, 2019 WL 5290524 (Fed. Cl. Spec. Mstr. July 10, 2019) (awarding $75,000.00 for actual pain and suffering and $190.00 for actual unreimbursable expenses); *Schandel v. Sec'y of Health & Human Servs.*, No. 16-0225V, 2019 WL 5260368 (Fed. Cl. Spec. Mstr. July 8, 2019) (awarding $85,000.00 for actual pain and suffering and $920.03 for actual unreimbursable expenses); *Bruegging v. Sec'y of Health & Human Servs.,* No. 17-0261V, 2019 WL 2620957 (Fed. Cl. Spec. Mstr. May 13, 2019) (awarding $90,000.00 for actual pain and suffering and $1,163.89 for actual unreimbursable expenses); *Pruett v. Sec'y of Health & Human Servs.*, No. 17-0561V, 2019 WL 3297083 (Fed. Cl. Spec. Mstr. Apr. 30, 2019) (awarding $75,000.00 for actual pain and suffering and $944.63 for actual unreimbursable expenses); *Bordelon v. Sec'y of Health & Human Servs.*, No. 17-1892V, 2019 WL 2385896 (Fed. Cl. Spec. Mstr. Apr. 24, 2019) (awarding $75,000.00 for actual pain and suffering); *Weber v. Sec'y of Health & Human Servs.*, No. 17-0399V, 2019 WL 2521540 (Fed. Cl. Spec. Mstr. Apr. 9, 2019) (awarding $85,000.00 for actual pain and suffering and $1,027.83 for actual unreimbursable expenses); *Garrett v. Sec'y of Health & Human Servs.*, No. 18-0490V, 2019 WL 2462953 (Fed. Cl. Spec. Mstr. Apr. 8, 2019) (awarding $70,000.00 for actual pain and suffering); *Attig v. Sec'y of Health & Human Servs.,* No. 17-1029V, 2019 WL 1749405 (Fed. Cl. Spec. Mstr. Feb. 19, 2019) (awarding $75,000.00 for pain and suffering and $1,386.97 in unreimbursable medical expenses); *Dirksen v. Sec'y of Health & Human Servs.*, No. 16-1461V, 2018 WL 6293201 (Fed. Cl. Spec. Mstr. Oct. 18, 2018) (awarding $85,000.00 for pain and suffering and $1,784.56 in unreimbursable medical expenses); *Kim v. Sec'y of Health & Human Servs.*, No. 17-0418V, 2018 WL 3991022 (Fed. Cl. Spec. Mstr. July 20, 2018) (awarding $75,000.00 for pain and suffering and $520.00 in unreimbursable medical expenses); *Knauss v. Sec'y of Health & Human Servs.,* No. 16-1372V, 2018 WL 3432906 (Fed. Cl. Spec. Mstr. May 23, 2018) (awarding $60,000.00 for pain and suffering and $170.00 in unreimbursable medical expenses); *Desrosiers v. Sec'y of Health & Human Servs.*, No. 16-0224V, 2017 WL 5507804 (Fed. Cl. Spec. Mstr. Sept. 19, 2017) (awarding $85,000.00 for pain and suffering and $336.20 in past unreimbursable medical expenses).

Significant pain was reported in these cases for up to eight months. However, in approximately half of the cases, these petitioners subjectively rated their pain as six or below on a ten-point scale. Petitioners who reported pain in the upper end of the ten-point scale generally suffered pain at this level for three months or less. Slightly less than one-half of these individuals had been administered one to two cortisone injections. Most of these petitioners pursued physical therapy for two months or less, and none had any surgery. The petitioners in *Schandel, Garrett,* and *Weber* attended PT from almost four to five months, but most of the PT in *Weber* focused on conditions unrelated to the petitioner's SIRVA. Several of these cases (*Goring, Lucarelli, Kent, Knauss*, *Marino*, *Kim*, and *Dirksen*) included a delay in seeking treatment. These delays ranged from about 42 days in *Kim* to over six months in *Marino*.

### ii. Above-median awards limited to past pain and suffering

In eight prior SPU cases, the petitioner was awarded compensation limited to past pain and suffering but above the median proffered SIRVA award, in ranges from $110,000.00 to $160,000.00.[17] Like those in the preceding group, the relevant petitioner's prognosis was "good," but these higher award cases were characterized either by a longer duration of injury or by the need for surgical repair. Thus, seven out of eight underwent some form of shoulder surgery, while one (*Cooper*) experienced two full years of pain and suffering, eight months of which were considered significant, and also required extended conservative treatment. On the whole, MRI imaging in these cases also showed more significant findings, with seven of eight showing possible evidence of partial tearing.[18] No MRI study was performed in the *Cooper* case.

---

[17] These cases are: *Nute v. Sec'y of Health & Human Servs.*, No. 18-0140V, 2019 WL 6125008 (Fed. Cl. Spec. Mstr. Sept. 6, 2019) (awarding $125,000.00 for pain and suffering); *Kelley v. Sec'y of Health & Human Servs.*, No. 17-2054V, 2019 WL 5555648 (Fed. Cl. Spec. Mstr. Aug. 2, 2019) (awarding $120,000.00 for pain and suffering and $4,289.05 in unreimbursable medical expenses); *Wallace v. Sec'y of Health & Human Servs.*, No. 16-1472V, 2019 WL 4458393 (Fed. Cl. Spec. Mstr. June 27, 2019) (awarding $125,000.00 for pain and suffering and $1,219.47 in unreimbursable medical expenses); *Reed v. Sec'y of Health & Human Servs.*, No. 16-1670V, 2019 WL 1222925 (Fed. Cl. Spec. Mstr. Feb. 1, 2019) (awarding $160,000.00 for pain and suffering and $4,931.06 in unreimbursable medical expenses); *Knudson v. Sec'y of Health & Human Servs.*, No. 17-1004V, 2018 WL 6293381 (Fed. Cl. Spec. Mstr. Nov. 7, 2018) (awarding $110,000.00 for pain and suffering and $305.07 in unreimbursable medical expenses); *Cooper v. Sec'y of Health & Human Servs.*, No. 16-1387V, 2018 WL 6288181 (Fed. Cl. Spec. Mstr. Nov. 7, 2018) (awarding $110,000.00 for pain and suffering and $3,642.33 in unreimbursable medical expenses); *Dobbins v. Sec'y of Health & Human Servs.*, No. 16-0854V, 2018 WL 4611267 (Fed. Cl. Spec. Mstr. Aug. 15, 2018) (awarding $125,000.00 for pain and suffering and $3,143.80 in unreimbursable medical expenses); *Collado v. Sec'y of Health & Human Servs.*, No. 17-0225V, 2018 WL 3433352 (Fed. Cl. Spec. Mstr. June 6, 2018) (awarding $120,000.00 for pain and suffering and $772.53 in unreimbursable medical expenses).

[18] In *Reed*, MRI showed edema in the infraspintus tendon of the right shoulder with a possible tendon tear and a small bone bruise of the posterior humeral head. In *Dobbins*, MRI showed a full-thickness partial tear of the supraspinatus tendon extending to the bursal surface, bursal surface fraying and partial thickness tear of the tendon, tear of the posterior aspects of the inferior glenohumeral ligament, and moderate sized joint effusion with synovitis and possible small loose bodies. In *Collado*, MRI showed a partial bursal surface tear of the infraspinatus and of the supraspinatus. In *Knudson*, MRI showed mild longitudinally oriented partial-thickness tear of the infraspinatus tendon, mild supraspinatus and infraspinatus tendinopathy, small subcortical cysts and mild subcortical bone marrow edema over the posterior-superior-lateral aspect of the

During treatment, each of these petitioners subjectively rated their pain within the upper half of a ten-point pain scale, and all experienced moderate to severe limitations in range of motion. Moreover, these petitioners tended to seek treatment of their injuries more immediately (e.g., within five to 45 days from onset). Duration of physical therapy ranged from one to 28 months and six out of the eight had cortisone injections.

### iii. Awards including compensation for both past and future pain and suffering

In only three prior SPU SIRVA cases has a petitioner been awarded compensation for *both* past and future pain and suffering.[19] In two of those cases (*Hooper* and *Binette*), petitioners experienced moderate to severe limitations in range of motion and moderate to severe pain. The *Hooper* petitioner underwent surgery, while in *Binette* petitioner was deemed not a candidate for surgery following an arthrogram. Despite significant physical therapy (and surgery in *Hooper*), medical opinions indicated that the relevant petitioner's disability would be permanent. In these two cases, petitioners were awarded above-median awards for actual pain and suffering as well as awards for projected pain and suffering for the duration of their life expectancies. In the third case (*Dhanoa*), petitioner's injury was less severe than in *Hooper* or *Binette*; however, petitioner had been actively treating just prior to the case becoming ripe for decision and her medical records reflected that she was still symptomatic despite a good prognosis. These petitioners were awarded an amount below-median for actual pain and suffering, but, in light of the facts and circumstances of the case, also awarded projected pain and suffering.

## VII. Appropriate Compensation in this SIRVA Case

### A. Pain and Suffering

In this case, Ms. Wilt's awareness of the injury is not disputed, as she has been established to be a competent adult with no mental/cognitive impairments that would impact her acuity. As a result, the magnitude of the pain and suffering award in this case turns on the other two factors – severity of injury and its duration.

A review of the complete record in this case reveals that Petitioner suffered a mild

---

humeral head adjacent to the infraspinatus tendon insertion site, and minimal subacromial-subdeltoid bursitis.

[19] These cases are: *Dhanoa v. Sec'y of Health & Human Servs.*, No. 15-1011V, 2018 WL 1221922 (Fed. Cl. Spec. Mstr. Feb. 1, 2018) (awarding $85,000.00 for actual pain and suffering, $10,000.00 for projected pain and suffering for one year, and $862.15 in past unreimbursable medical expenses); *Binette v. Sec'y of Health & Human Servs.*, No. 16-0731V, 2019 WL 1552620 (Fed. Cl. Spec. Mstr. Mar. 20, 2019) (awarding $130,000.00 for actual pain and suffering, $1,000.00 per year for a life expectancy of 57 years for projected pain and suffering, and $7,101.98 for past unreimbursable medical expenses); *Hooper v. Sec'y of Health & Human Servs.*, No. 17-0012V, 2019 WL 1561519 (Fed. Cl. Spec. Mstr. Mar. 20, 2019) (awarding $185,000.00 for actual pain and suffering, $1,500.00 per year for a life expectancy of 30 years for projected pain and suffering, $37,921.48 for lost wages).

to moderate shoulder injury that was serious enough for arthroscopic surgery to be recommended and performed. However, after two rounds of physical therapy and surgery, Petitioner had experienced substantial improvement just over six months after vaccination, and by ten months after vaccination was experiencing only occasional residual effects, although Petitioner reports that she remains somewhat restricted in her activities.

The duration of Petitioner's shoulder injury was on the shorter side when considered in the light of the other awards discussed above. Petitioner's shoulder symptoms were mostly improved just after six months following vaccination, and were only occurring on an occasional basis by ten months following her vaccination. She underwent two rounds of physical therapy totaling 20 sessions, chiropractic treatment, and shoulder surgery. By April 7, 2017, two months after surgery and just over six months following her vaccination, she was largely pain free and had near full range of motion. Ex. 3 at 2-5. By July 13, 2017, five months after her surgery and ten months following her vaccination, Petitioner was experiencing intermittent achy discomfort, but otherwise displayed full range of motion and good strength. Ex. 10 at 28-32.

With respect to the severity of Petitioner's injury, following her vaccination until her surgery she reported pain levels ranging between 6-7 on a scale of 1-10. After her shoulder surgery and post-operative physical therapy, Petitioner had a good recovery, experiencing significant pain relief and reduced pain levels. By March 2, 2017, Petitioner's pain levels were mostly in the 1-3 range on a scale of 1-10, and a month later she had minimal pain plus near full range of motion. I therefore find that Petitioner's injury was at its most severe for a period of just over five months, from vaccination until one month after surgery, with symptoms thereafter nearly gone.

This case is highly comparable to *Knudson,* which resulted in an above-median award of $110,000.00 for actual pain and suffering.[20] Petitioners in both cases sought medical attention for their shoulder injuries promptly, two weeks after vaccination in *Knudson* and six days after vaccination in this case. In both cases, the petitioners underwent surgical repair with a good recovery, along with two rounds of physical therapy, one before surgery and another after. Both had similar ratings of their pain, with the *Knudson* petitioner rating her pain between 4-8/10 in the weeks following her injury, and Petitioner in this case rating her pain generally around 6/10 in the comparable timeframe.

In addition, both Petitioner in this case and Petitioner in *Knudson* experienced generally mild pain after surgery, with Petitioner in this case experiencing slightly more severe pain than Petitioner in *Knudson.* Petitioner in *Knudson* reported three months after surgery that she could swim again and was not having any trouble with her arm at all. *Knudson* at *8. In contrast, Petitioner in this case reports that she still experiences

---

[20] I do note that the record from this case includes evidence of pre-vaccination shoulder symptoms that arguably could have militated in favor of an even lower award. However, the parties have not raised this argument, and it is otherwise apparent from the record that the majority of the pain and symptoms for which Petitioner received treatment following vaccination (including surgery and two rounds of physical therapy) were related to her vaccine-related injury. Thus, I find it reasonable to award the same amount as in *Knudson.*

weakness in her shoulder during activities such as house work, cooking, and outdoor chores. Ex. 13 at 2.

I am not persuaded by Petitioner's argument that her injury is similar to, or even slightly worse than, that in *Collado*. The petitioner in that case experienced more severe pain, at a level of 8-10 on a scale of 1-10, for a period of three months. *Collado* at *2-3. That petitioner also had more extensive surgical procedures, including an open biceps tenodesis requiring a 4 cm incision, while Mrs. Wilt's surgeon elected not to perform a biceps tenodesis. *Collado* at *3; Ex. 3 at 36-37. In addition, at seven months after vaccination, the petitioner in *Collado* reported pain that was "about 40% improved," while Mrs. Wilt's pain was largely gone by the same time in her recovery. *Collado* at *4; Ex. 3 at 2; 8 at 312. The *Collado* award therefore exceeds what is appropriate under these facts.

To further support the requested award, Petitioner emphasizes that Dr. Westphal indicated that her recovery would take a year. Pet. Br. at 9-10; Ex. 10 at 28. However, I note that this statement was made by PA Fittipaldi in the context of a visit *five months after surgery* where Petitioner reported steady improvement and "achiness if she overdoes it and occasional sleep disturbance." Ex. 10 at 28. Petitioner had been under the impression that she should be pain free at this point, and PA Fittipaldi "explained to her that *full* recovery takes approximately 1 year." *Id.* (emphasis added). It thus appears that PA Fittipaldi was conveying to Petitioner that she should not be concerned by occasional pain during the year following surgery - not that she would not recover until a full year had passed.

### B. Actual Unreimbursable Expenses

In her damages brief, Petitioner requests $270.00 for unreimbursed out of pocket expenses, and filed Ex. 11 to substantiate them (although she did not substantiate a higher sum).[21] Pet. Br. at 10. Respondent has not challenged this aspect of damages, and I therefore find they should be awarded.

### VIII. Conclusion

For all of the reasons discussed above and based on consideration of the record as a whole, **I find that $110,000.00 represents a fair and appropriate amount of**

---

[21] In Petitioner's Affidavit Regarding Damages dated January 24, 2020, Petitioner maintained that her "estimated out of pocket costs are $1,000 for caregiver assistance as I recovered from surgery, meal costs, vehicle expenses." Ex. 13 at 3. On January 30, 2020, I issued an order noting that the out of pocket expenses listed in this affidavit differed from that claimed in her damages brief. Scheduling Order, issued Jan. 30, 2020 (ECF No. 43). I therefore informed Petitioner that if she intended to seek reimbursement for more than $270 in out of pocket costs, she must file a status report so indicating and must provide supporting documentation, and that if she did not file such a status report and supporting documentation by February 7, 2020, "Petitioner's request for reimbursement of out of pocket expenses will be deemed to be $270.00 as requested in the damages brief." *Id.* at 2. Petitioner did not act in response to this order.

**compensation for Petitioner's actual pain and suffering.**[22] **I also find that Petitioner is entitled to $270.00 in actual unreimbursable expenses.**

Based on the record as a whole and arguments of the parties, **I award Petitioner a lump sum payment of $110,270.00 in the form of a check payable to Petitioner.** This amount represents compensation for all damages that would be available under § 15(a).

The clerk of the court is directed to enter judgment in accordance with this decision.[23]

**IT IS SO ORDERED.**

<u>s/Brian H. Corcoran</u>
Brian H. Corcoran
Chief Special Master

---

[22] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* § 15(f)(4)(A); *Childers v. Sec'y of Health & Human Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Human Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

[23] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.